## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Weston J. Stow

       v.

Robert P. McGrath, et al.

Civil No. 17-cv-088-LM
Opinion No. 2021 DNH 062 P

## **O R D E R**

Plaintiff Weston J. Stow, an inmate in the custody of the New Hampshire Department of Corrections ("NHDOC"), has moved for summary judgment (doc. no. 215) on his remaining federal and state-law claims, in which he contends the defendants—all now-retired NHDOC employees—improperly retaliated against him for exercising his First Amendment rights. The defendants collectively oppose Stow's motion and have separately filed two cross-motions for summary judgment (doc. nos. 211 & 212) asserting, among other things, that Stow failed to properly exhaust his available administrative remedies and that the evidence fails to support any of Stow's claims.

After considering the parties' detailed briefings and the lengthy evidentiary record attached thereto in the light most favorable to Stow, the court concludes that (1) no reasonable factfinder could find that Stow properly exhausted the administrative remedies available for his federal claims concerning defendants Lirette and Perkins's statements, and (2) the defendants did not violate any "clearly established" constitutional or statutory right by threatening to "take a shot" at Stow or by recommending Stow for an intra-state prison transfer, even though that transfer resulted in a substantial reduction in employment wages. Accordingly, the

court grants summary judgment against Stow and in the defendants' favor on Stow's federal-law claims. Additionally, the court declines to exercise supplemental jurisdiction over Stow's state-law claims and thus dismisses them without prejudice.

## BACKGROUND

This case concerns purported retaliation against a state prisoner for exercising his constitutional rights. Weston Stow, an inmate in the custody of NHDOC who has been incarcerated for over thirty years, contends that in March 2016, defendants Hardy, Lirette, and McGrath—all former corrections officers for NHDOC—threatened him and ultimately "caused [him] to be transferred" from the New Hampshire State Prison ("NHSP") in Concord to the Northern New Hampshire Correctional Facility ("NCF") in Berlin, New Hampshire for filing various administrative grievances. Oct. 13, 2017 R&R (doc. no. 65, at 10). Stow also contends that, during his efforts to seek legal relief for this transfer, defendant Perkins—a librarian for NHDOC—improperly threatened Stow for filing grievances appealing the denial of requests for extended library time. The court summarizes the events underlying Stow's remaining claims in this case below:

I.    <u>Failure to timely deliver Stow's medications</u>

In February 2016, Stow was incarcerated in the North Unit at the New Hampshire State Prison in Concord, where he was given a prescription for heart medication. On Friday, February 5, Stow complained to NHSP staff that he did not receive his prescription refill; however, no officers delivered additional doses from the prison pharmacy until the following Monday morning. Stow submitted an

Inmate Request Slip ("IRS") about the failure to timely refill his prescription through NHDOC's administrative grievance process on Sunday.  See Feb. 7, 2016 IRS to Health Services (doc. no. 215-5, at 4-9).

Lieutenant Leo Lirette, who was directly involved in addressing this issue, recalls that the unit staff on duty did not retrieve Stow's medication because they thought the pharmacy was closed over the weekend.  Lirette Decl. (doc. no. 212-5, ¶¶ 4-5).  Upon learning of the issue when he returned to work on Sunday, Lirette "advised [prison] staff that they needed to pick up medications from the pharmacy seven days a week and, given the importance of the issue, they needed to go to the pharmacy to check and see if any medications needed to be picked up—regardless of whether the pharmacy was opened or closed."[1] Id.  On or about February 9, 2016, Sergeant Inman and Correctional Office Ovori called Stow to the officer in charge's office to question him about the incident, including why he did not come to them or other officers about his missing medication at any point before filing an IRS Sunday evening.  Am. Compl. (doc. no. 28-2, at 11).  Stow answered that it was "not [his] job to chase down" his medications.  On February 10, 2016, NHSP Major Jon Fouts, in a response to Stow's IRS, wrote that the situation "ha[d] been reviewed," "some procedural problems were noted," and "[c]orrections ha[d] been made that should prevent this from happening again."  See Feb. 8, 2016 IRS to Fouts (doc. no. 215-5, at 4-9).

---

[1] In his objection, Stow claims Lirette did not work that Sunday and further disputes the veracity of Lirette's representations, given that he received his medication on Monday, not Sunday.  Stow's Obj. to Mot. for Summ. J. (212) (doc. no. 233, at 5-8).  Disputes as to these facts are not material to the resolution of the parties' motions.

In the days thereafter, Unit Manager Robert McGrath "had a conversation" with Sergeant Inman "about the process for delivery medications to North Unit." McGrath Responses to RFAs (doc. no. 216-2, at 4). Stow alleges that, in the days following this conversation, on an unspecified date between February 12 and February 28, 2016, McGrath threatened Stow "in passing," stating: "You made a big mistake, if I get a clean shot at you I'm going to take it." Am. Compl. (doc. no. 28-2, at 11). Stow's filings do not elaborate on the circumstances of this alleged threat, including the location, the surrounding context, if any, or the presence of any witnesses. See also Mar. 30, 2016 IRS to Classifications (doc. no. 29-3, at 7) (first disclosing threat in an IRS). Stow speculates that McGrath made this statement because he was angered by, or took offense to, Stow's filing of administrative grievances regarding the medication incident. See Am. Compl. (doc. no. 28-2, at 11) (alleging that Stow had "the impression McGrath was agitated and took offense with plaintiff's decision to process the request slips"). McGrath denies ever uttering those words.

II.   <u>Complaints about North Unit's ventilation system</u>

A few weeks after his medication issues, Stow complained to North Unit staff that the exhaust vents in his cell were not working properly, resulting in decreased air quality. See Feb. 22, 2016 IRS to Hardy (doc. no. 29-4, at 25). In response, Sergeant Richard Hardy asked maintenance staff to inspect the ventilation system. Hardy then took a 10-day leave of absence for medical reasons. See id.; Hardy Decl. (doc. no. 212-3, at ¶¶ 4-5). When Hardy returned, Stow asked what had been done to address the ventilation issue. Hardy responded that maintenance had been notified. Additionally, he reportedly followed up with the maintenance team. See

4

Hardy Decl. (doc. no. 212-3, at ¶ 5).  According to Hardy, "it took some time for maintenance to fix the ventilation problem."  Id.  In response to a later IRS by Stow, maintenance worker Corey Martin informed Stow that replacement of the air ducts began in May 2016 and was expected to be completed by the end of June.  See May 27, 2016 IRS to Maintenance (doc. no. 212-11, at 1).

III.    Transfer from NHSP to NCF

One to two months after these incidents, Classifications—the unit responsible for determining each inmate's custody level and housing unit—decided to transfer Stow from the NHSP in Concord to the NCF in Berlin.  See Mathews Decl. (doc. no. 212-2, ¶ 2).  As a result of the transfer, Stow lost his kitchen job at NHSP, at which he worked seven days a week, earning approximately twenty-one dollars per week.  See Stow Institutional Job History (doc. no. 212-12); Stow Obj. to Mot. for Summ. J. (212) (doc. no. 233, at 15); Am. Compl. (doc. no. 28-2, at 23).

According to Glenn Mathews, an NHDOC officer assigned to Classifications:

Determining inmate housing within a correctional system is a complicated process that is dependent on numerous factors.  The movement of inmates among housing units can be security-related, bed-space driven, or program-related.

For example, the classifications unit regularly moves inmates to deter complacency and to prevent inmates from becoming too comfortable with their surroundings/environment.  Inmates are also moved when there is information available that suggests, for example, gang-related activity, drug trafficking or other drug activity, or strong-arming activity.

The classifications unit also often needs to redistribute inmates to address bed-space issues and protective custody issues. . . .  If there are no beds available in general population units at NHSP, but there are available beds in general population units at NCF, the inmate may be moved to NCF.

Mathews Decl. (doc. no. 212-2, ¶¶ 5-7).

Mathews further explains that: "[t]he movement of inmates from NHSP to NCF occurs on a regular basis." Id. ¶ 10 (listing number of inmates transferred from NHSP to NCF between January 25 and March 30, 2016). He relays that "[a]s of 2016, the inmates selected for transfer to NCF generally meet certain objective criteria, including (a) the inmate has more than six months before reaching his minimum parole date; (b) the inmate is not a participant in programming or educational programming; (c) the inmate has no keep-separates or protective custody issues at NCF; and (d) the inmate does not have any scheduled upcoming court dates or medical appointments in the Concord area." Id. ¶ 8. He also asserts that transfer decisions are "generally not made at the housing level," id. ¶ 3, and that, under "NHDOC policy, the classifications unit does not need any particular reason to move or transfer inmates," id. ¶ 9.

On or about March 28, 2016, Mathews called North Unit asking for the names of potential candidates for transfer to NCF. See Hardy Decl. (doc. no. 212-3, ¶ 7). Hardy reportedly answered the call and asked McGrath and Lirette, who were standing nearby, if they had suggestions. Id. In response, McGrath suggested adding Stow's name to a list of several candidates, which Hardy then relayed to Mathews. McGrath Decl. (doc. no. 212-4, ¶¶ 5-6); Hardy Decl. (doc. no. 212-3, ¶ 8). McGrath claims that, at the time, he believed "Stow was a good candidate for transfer NCF for two primary reasons: (a) it was [his] understanding at the time that . . . Stow was having difficulty adjusting to roommates in his cell; and (b) the move would accommodate his concerns and serve to correct the problem that the

ventilation system in his North Unit cell was not working properly."[2]  McGrath

Decl. (doc. no. 212-4, ¶ 6); see also id. ¶ 8 (explaining that, in response to the

ventilation problem, McGrath chose not to move Stow to the unaffected side of

North Unit because doing so would prompt additional requests from other inmates,

creating "an impossible managerial situation").  Two days later, on March 30, 2016,

Classifications relocated Stow to NCF.

IV.   Stow's opposition to his transfer

The same day Stow was transferred, he submitted an IRS to McGrath asking

why he was moved to Berlin and who besides McGrath had approved the move.

Mar. 30, 2016 IRS to McGrath (doc. no. 215-5, at 11).  Though McGrath initially

replied that "[t]here was no reason," he also represented (in the same response) that

it was "[f]or the safety and security of the institution!"  Id.  Throughout the

following month, Stow sent multiple IRSs to McGrath, who maintained that there

was no ulterior reason for Stow's transfer.  See, e.g., Apr. 4, 2016 & Apr. 5, 2016 IRS

to McGrath (doc. no. 215-5, at 12-13); Apr. 12, 2016 IRS to McGrath (doc. no. 215-6,

at 8) (McGrath disclosing to Stow the two reasons why he thought Stow was a good

---

[2] Stow asserts there are "serious factual" discrepancies with Hardy, Lirette, and McGrath's respective recollections of this event.  Stow's Obj. to Mot. for Summ. J. (212) (doc. no. 233, at 8-11).  To the extent any discrepancies exist, Stow has failed to show they are material to any party's motion for summary judgment.  Stow also disputes McGrath's "reasons as being fictitious and speculative," given his history with McGrath.  Id. at 11-12.  The court recognizes Stow's general distrust of the defendants' representations, but stresses that no party can meet their burdens of proof or persuasion based on "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation."  Theidon v. Harvard Univ., 948 F.3d 477, 494 (1st Cir. 2020) (quoting Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010)).

candidate for transfer).[3]  Stow also sent similar IRSs to Lirette and other NHSP staff, including Classifications staff, regarding his transfer.  See, e.g., Apr. 5, 2016 IRS to Lirette (doc. no. 216-6).  Lirette responded that while he did not know the reason for Stow's transfer and had no issue with Stow returning, "that decision [was] up to [C]lassifications."  Id.  Mathews, in turn, reportedly told Stow that, in Stow's particular case, the move "was a result in bed space/institutional need" and had "nothing to do with the situation [Stow] presented" concerning McGrath.[4]  Mathews Decl. (doc. no. 212-2, ¶ 12).

Within six weeks of arriving at NCF, Stow secured a job in the kitchens, working in a similar role to his work position at NHSP, but with only five workdays, thus earning between ten to fifteen dollars per month.  Stow Institutional Job History (doc. no. 212-12); Am. Compl. (doc. no. 28-2, at 23) (explaining that Stow started at ten dollars per week, which rose to fifteen dollars after six months).  Stow continued to disfavor incarceration at NCF over NHSP and, as a result, submitted many IRSs and grievance slips regarding his transfer.  See, e.g., Part III, supra.  By May 2016, Stow elevated his complaints to the NHSP Warden, who rejected Stow's

---

[3] In his declaration, McGrath discloses that, one month before Stow was transferred to NCF, he provided to Classifications the name of an inmate who had raised concerns about the cleanliness of the showers in the housing unit.  McGrath Decl. (doc. no. 212-4, ¶ 10).  McGrath asserts that the cleanliness issue could not be fully corrected despite the maintenance staff's efforts, so, "to try to address" the inmates concerns, "it made sense" to provide the inmate's name to classifications for transfer to NCF's newer and better facilities."  Id.  He maintains he treated Stow's "situation in a similar manner."  Id.  In considering the parties' summary judgment motions, the court views these facts and draws inferences in the light most favorable to the non-movant—for Stow's motion, in the defendants' favor and, for the defendants' motion, in Stow's favor.

[4] Mathew's declaration purports to quote a response to an IRS.  The defendants' evidentiary submissions, however, do not appear to include the quoted IRS.

claims that prison staff initiated Stow's transfer in retaliation for utilizing the prison's grievance process and, thereafter, attempted to prevent him from using the grievance process. Warden's May 20, 2016 Response to Stow's Grievances re: Transfer (doc. no. 212-7, at 1-2). The Warden further responded:

> [T]he approach you used in sending multiple requests to North Unit Staff in attempt to gain information about the reason for your transfer was not consistent with our chain-of-command expectations. The appropriate process to address your concerns regarding your transfer from the NHSPM to NCF should have been to direct your concerns to the Unit Manager, followed by communication to the Major and ultimately the Warden. The Unit Manager acted within the scope of his authority and Departmental Policy when he instructed you to stop addressing your concerns to subordinate staff, who were not involved in making the decision to transfer you from NHSPM to NCF.

Id. at 2.

Despite these instructions, Stow continued to send IRSs to NHSP staff regarding his transfer which further antagonized NHSP staff. At the end of May, for example, Stow sent an IRS to Lirette asking further questions about the events preceding his transfer. May 31, 2016 IRS to Lirette (doc. no. 212-8). A week later, Lirette responded:

> You were move[d] from [one] C-3 unit to another C-3 unit. We do not need a reason. You have written many request slips to many people about this issue and the answer is the same as I am writing now. I do not want you writing to me anymore about this issue. You are abusing the inmate request system. If you write me again about the same issue, I will write you up.

Id. Stow did not heed NHSP staff's warnings and instead continued to file administrative complaints relating to the transfer, including to the NHDOC Commissioner's Office. See, e.g., Aug. 22, 2016 IRS to Commissioner's Office (doc. no. 35-4, at 1).

V.       Requests for extended law library time

In September 2016, Stow filed a complaint in Merrimack County Superior Court against McGrath and other prison officials seeking to hold them criminally liable for transferring him, purportedly in violation of NHDOC policies, and to remove them from their respective positions.  See Order, Stow v. McGrath, No. 217-2016-cv-540 (N.H. Super. Ct., Merrimack Cty. Feb. 9, 2017) (doc. no. 211-6).  On February 9, 2017, the Superior Court dismissed most of Stow's complaint with prejudice but gave Stow thirty-days leave to amend his complaint as to its allegations of retaliation.  Id.  In doing so, the court further stated that if Stow did not file an amended complaint within thirty days, his retaliation claim would "also be [dismissed] with prejudice."  Id.

On March 6, 2017, Stow sent an IRS to NCF law librarian Angela Poulin asking to be scheduled for extended time—specifically six hours per week—in the NCF law library because he had an active case in New Hampshire Superior Court. Mar. 6, 2017 IRS to Poulin (doc. no. 30-1, at 1).  Poulin responded to Stow's IRS in writing by stating: "This case was dismissed and you have until [March 17, 2017] to appeal.  Therefore, extended time in April is denied.  Please come use the law library on all open April [Wednesdays and Thursdays from 8:20 a.m. to 10:20 a.m.]. Thank you."  Id. (alterations reflect abbreviated nomenclature used by Poulin).  The following day, Stow issued a second IRS to Poulin claiming that her "information regarding the case being dismissed [was] wrong" and demanding "the full name" of the person who gave Poulin the purportedly wrong case information.  Mar. 7, 2017 IRS to Poulin (doc. no. 30-1, at 3).  He also renewed his request for extended time. Poulin answered: "Two clerks consulted on this request (names not known).  You have time until April 2017 law library scheduling closes if you wish to question

their office."  Id.  Additionally, Poulin informed Stow that she had changed Stow's

normally scheduled library time to accommodate a scheduling conflict presented by

Stow's morning kitchen job at NCF.  Id.

On March 10, 2017, Stow sent a third IRS to Poulin, stating, among other

things: "For the last time I would again ask that you schedule me for two (2)

additional [hours] of April law library time which I need due to the active case. . . .

This is your problem and your false statement saying 'this case was dismissed.'"

Mar. 10, 2017 IRS to Poulin (doc. no. 30-1, at 7).  He also sent two IRSs on the

matter to the NCF Director of Programs, accusing Poulin of violating NHDOC

policy and state law, and asserting that state law mandated "the forthwith

dismissal of any state employee who violates the oath of office."[5]  Mar. 9, 2017 IRS

to NCF DoP (doc. no. 30-1, at 5-8); Mar. 10, 2017 IRS to NCF DoP (doc. no. 30-1, at

9-11).  Days later, Poulin replied: "I have discussed this issue with my supervisor,

Dr. Anne Davis.  You are free to contact the court yourself and/or Dr. Davis [the

NHDOC Education Director].  Thank you."  Mar. 10, 2017 IRS to Poulin (doc. no. 30-

1, at 7).  Stow then sent an IRS to Davis, accusing Poulin of acting "with malice, ill

will" and of "deliberately and intentionally discriminat[ing] against [him]" by

denying him extended law library time, and being "deceitful and intentionally

evasive in her answers" to his IRSs.  Mar. 14, 2017 IRS to Davis (doc. no. 30-2, at 1).

In response, Davis told Stow that Poulin's supervisor, Librarian John Perkins, was

---

[5] Stow also demanded to know the names "of any clerks of court who may be
providing false and misleading information [because] they are bound by rules of
conduct and ethics as well."  Mar. 9, 2017 IRS to NCF DoP (doc. no. 30-1, at 5-8);
Mar. 10, 2017 IRS to NCF DoP (doc. no. 30-1, at 9-11).  He further suggested that he
was a better judge of whether his case was closed or dismissed than Poulin, give
their respective experiences and education.

in the process of responding to Stow.  Id.  Additionally, he demanded that Stow "decease (sic) with name-calling and state facts when writing."  Id.

Around this time, Perkins reportedly "became aware" that "Poulin felt intimidated" and that Stow's demands caused Poulin "concern about dealing with [Stow] in person."  Perkins Decl. (doc. no. 211-2, ¶¶ 3-4).  According to his declaration:

> It was my understanding that Ms. Poulin had confirmed with both the New Hampshire state court system and the Attorney General's Office that Mr. Stow had no open case.  I also called the New Hampshire court system, as well as the Attorney General's Office, to reconfirm this information.  When I called the Attorney General's Office, I believe I spoke with a legal secretary.  I asked her whether Weston Stow had an open court case, and the answer was no.  I reasonably relied upon the information provided to me by the New Hampshire court system and the Attorney General's Office.

Id. ¶ 6.  Perkins responded to Stow's March 10 IRS as follows:

> Both Ms. Poulin and I have confirmed with the New Hampshire court system that you do not have a current case.  If, in the future, you do have a current case you are welcome to ask for extended library time which may or may not be granted at our discretion.  In the mean time [sic] I am giving you a direct order to discontinue any and every complaint on this issue.  You have no basis for complaint on this issue. If you continue to complain you will be disobeying a direct order from a staff member.  I am expecting absolute respect from you in return for library privileges.  Feel free to ask questions or submit requests to me. I am familiar with the PPDs and the laws of the State.  Including one citation after another in your communications is not going to alter facts.  Ms. Poulin is fair and follows policy.  Refer correspondence to me.  I will file your correspondence.

Mar. 10, 2014 IRS (doc. no. 211-3, at 2).

According to Perkins, "the purpose of [this] response was "to direct Mr. Stow to stop harassing and acting in a confrontational manner toward Ms. Poulin," and "to convey to him that sending multiple IRSs to Ms. Poulin on the same subject,"

instead of to Perkins, "was inappropriate."  Perkins Decl. (doc. no. 211-2, ¶ 8).  Stow nevertheless continued to send multiple IRSs and other correspondence relating to extended library time to numerous NHDOC personnel, including Poulin.  See Mar. 25, 2017 Ltr. from Christopher Kench, Director, Office of the Commissioner, to Stow (doc. no. 211-7) (denying Stow's request for the termination of Perkins and Poulin and notifying him that "[d]isciplinary action can be taken against an inmate abusing the Grievance process"); Apr. 9, 2017 IRS to Poulin (doc. no. 30-3, at 1) (denying continued demand for extended time as, per the court, Stow's motion for reconsideration was denied).  On or about April 12, 2017—three days after Poulin had again denied his request for extended time—Stow wrote back to Poulin, asserting, "[b]ased upon his information and belief," that his case was current, accusing Poulin of making a "false statement," and stating that Poulin's "questioning [of] the veracity of [his understanding] to be unjustified and offensive." Apr. 12, 2017 IRS to Poulin (doc. no. 30-3, at 3, 5).  He also again demanded detailed information about Poulin's call with the court.  Id.

Poulin initially denied Stow's IRS request, reminding him that the "fact that the court's response was not to [his] liking was not [her] concern."  Id.  Nevertheless, that same day, she advised Stow in a separate letter that his May law library appointments had been rescheduled to include extended time.  Apr. 14, 2017 Ltr. from Poulin to Stow (doc. no. 30-3, at 6).  The record does not reflect that Stow was ever disciplined for sending additional IRSs to Poulin despite Perkins's direct order.

VI.    Stow's claims

The defendants collectively seek summary judgment on Stow's remaining claims in this action.  These claims, as identified in this court's October 17, 2017

report and recommendation, are as follows.  For Claims 1(a), 1(d)(i), 1(d)(iii),

1(d)(iv), 1(d)(v), and 1(d)(vi) ("retaliatory transfer claims"), Stow asserts that:

> 1.      McGrath, Lirette, and Hardy, acting individually and in conspiracy with one another, caused Stow to be transferred from the NHSP to NCF on March 30, 2016, in retaliation for Stow's administrative complaints about medication refill procedures and inadequate ventilation on his housing unit, causing Stow to lose his NHSP kitchen job, to have his pay decreased, and subjecting Stow to adverse conditions of confinement, embarrassment, and a loss of dignity, when other inmates who had made similar administrative complaints were not transferred to NCF and did not lose their prison jobs, in violation of:
>
> a.      Stow's First Amendment rights to free speech and to petition the government for a redress of grievances[; and] . . .
>
> d.      state common law, rendering them liable for damages for:
>       i.        conspiracy, . . .
>       iii.      malfeasance in public office,
>       iv.      misfeasance in public office,
>       v.       negligence, and
>       vi.      tortious interference with contractual relations.

Oct. 13, 2017 R&R (doc. no. 65, at 10).  For Claims 2(a), 2(c)(ii), and 2(c)(iii) ("big

mistake" or "retaliatory threat claims"), Stow alleges that:

> 2.      McGrath threatened Stow with bodily harm by stating "You've made a big mistake, if I get a clean shot at you I'm going to take it," in retaliation for Stow's administrative complaints about medication refill procedures and  inadequate ventilation on his housing unit, in violation of:
>
> a.      Stow's First Amendment rights to free speech and to petition the government for a redress of grievances[; and] . . .
>
> c.      state common law, rendering them liable for damages for:
>       . . .
>       ii.       malfeasance in public office, and
>       iii.      misfeasance in public office.

Id. at 11.  Finally, for Claims 5(a), 5(c)(i), 5(c)(ii), and 5(c)(iii) ("denial-of-process

claims"), Stow alleges that:

5.   Lirette and Perkins improperly denied Stow access to the administrative grievance system by ordering Stow not to make administrative requests or complaints concerning Stow's transfer to NCF and the April 2017 denial of extended law library time, and threatened to take disciplinary action against Stow if he did so, in retaliation for filing administrative grievances, in violation of:

a.   Stow's First Amendment rights to free speech and to petition the government for a redress of grievances[; and] . . .

c.   state common law, rendering them liable for damages for:
   i     malfeasance in public office,
   ii    misfeasance in public office, and
   iii   negligence.

Id. at 13.[6]

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." Baum-Holland v. Hilton El Con Mgmt., LLC, 964 F.3d 77, 87 (1st Cir. 2020) (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). "Facts are material when they have the potential to affect the outcome of the suit under the applicable law." Id. (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)).

"The party moving for summary judgment bears the initial burden of showing that no genuine issue of material fact exists." Feliciano-Munoz v. Rebarber-Ocasio,

_____

[6] The court previously dismissed Claims 1(b), 1(c), 1(d)(ii), 1(e), 1(f), 2(b), 2(c)(i)-(iii), 2(d), 2(e), 3(a)-(e), 4(a)-(e), 5(b), 5(d), 5(e), 6(a)-(d), 7(a)-(e), 8(a)-(f), 9(a)-(b), 10(a)-(b), 11(a)-(d), 12(a)-(c), and 13. See Oct. 30, 2017 Endorsed Order.

970 F.3d 53, 62 (1st Cir. 2020) (internal citation omitted).  Then, "[the nonmoving party] must respond to a properly supported motion with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which [it] has the burden of proof."  Id. (quoting Prado Álvarez v. R.J. Reynolds Tobacco Co., 405 F.3d 36, 39 (1st Cir. 2005)) (alteration in original).  In doing so, neither the movant nor the non-movant can "rely on 'conclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'"  Theidon, 948 F.3d at 494 (quoting Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010)).  In ruling on such motions, the district court must "constru[e] the record in the light most favorable to the nonmoving party and resolv[e] all reasonable inferences in that party's favor."  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).  "The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish . . . an element essential to that party's case" or defense on which "that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).  "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Id.  The court thus views each party's burden of proof and persuasion on their respective motions for summary judgment through this prism.  See Est. of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010).

## DISCUSSION

Both Stow and the defendants contend that they are entitled to summary judgment on the merits of Stow's federal and state-law claims.  On the one hand, Stow contends that the record evidence shows the defendants recommended him for transfer in retaliation for submitting grievances, this recommendation was the but-for cause for his alleged injuries, and certain defendants threatened him with disciplinary action for seeking relief through NHDOC's grievance process.  The defendants, on the other hand, dispute Stow's view of the evidence, arguing that, even in the light most favorable to Stow, the evidentiary record falls short of presenting a prima facie case for Stow's federal or state-law claims or of disproving their entitlement to qualified immunity.  Additionally, the defendants seek summary judgment on procedural grounds: specifically, that Stow failed to properly exhaust his administrative remedies, as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a).

The court approaches the parties' cross-motions in three steps: First, the court addresses whether Stow's federal claims are procedurally barred on exhaustion grounds.  Second, the court assesses whether either party is entitled to summary judgment on any properly exhausted federal claims.  Finally, the court evaluates whether it should exercise supplemental jurisdiction and consider the merits of Stow's state-law claims.  As discussed below, the court finds that Stow may not proceed to trial on any of his federal claims.  Additionally, the court declines to exercise supplemental jurisdiction and thus dismisses, without prejudice, the state-law claims that relate to Stow's terminated federal-law claims.

I.      <u>Failure to properly exhaust administrative remedies</u>

As an initial matter, the defendants contend that this court should dismiss Stow's federal claims (Claims 1(a), 2(a), and 5(a)) because Stow did not properly exhaust his administrative remedies through NHDOC's three-step administrative grievance process.  The PLRA provides that: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). As explained by the Supreme Court, this provision requires "proper exhaustion" of administrative remedies, which "means using all steps that the agency holds out, and doing so <u>properly</u> (so that the agency addresses the issues on the merits)." Woodford v. Ngo, 548 U.S. 81, 84 (2006) (emphasis in original).  Under this framework, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Jones v. Bock, 549 U.S. 199, 218 (2007). Additionally, "[p]risoners must . . . exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by" the prison's specific administrative process.  Woodford, 548 U.S. at 85.

"The failure to exhaust available grievance remedies is an affirmative defense as to which the defendants bear the burden of proof."  Czekalski v. Hanks, No. 18-cv-592-PB, 2020 WL 7231358, at *12, 2020 U.S. Dist. LEXIS 231179, at *35 (D.N.H. Dec. 8, 2020); <u>see</u> <u>also</u> Peterson v. Wrenn, No. 14-cv-432-LM, 2017 WL 401189, at *10, 2017 U.S. Dist. LEXIS 12225, at *31 (D.N.H. Jan. 30, 2017).  To prevail at the summary judgment stage, the defendants "must show that no reasonable [factfinder] could find that [the plaintiff] properly exhausted the administrative remedies available to him before commencing [the] action."

Polansky v. McCoole, No. 13-cv-458-JL, 2016 WL 237096, at *3, 2016 U.S. Dist. LEXIS 6476, at *8 (D.N.H. Jan. 20, 2016); see also Peterson, 2017 WL 401189, at *10, 2017 U.S. Dist. LEXIS 12225, at *31 ("Claims for which administrative remedies have not been exhausted" prior to the commencement of an action "are subject to dismissal." (citing Medina-Claudio v. Rodriguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002))).  If the defendants have made that showing, the burden then shifts to the inmate to "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him.'"  Czekalski, 2020 WL 7231358, at *12, 2020 U.S. Dist. LEXIS 231179, at *35 (quoting Albino v. Baca, 747 F.3d 1162, 1172 (9th Cir. 2014)).

A.    NHDOC's three-step grievance process

In accordance with this framework, the court first reviews the requirements of NHDOC's three-step grievance process.  NHDOC has in place a three-step grievance policy that inmates must use to advance any complaints, claims, or grievances they may have during their incarceration.  The grievance policy operates as follows:

First, an inmate must send an IRS "to the lowest level staff person with the authority to address the issue raised." NHDOC Grievance Policy (doc. no. 211-8, § IV(A)(3)).  "This may be a Correctional Officer or other unit staff up to the Unit Manager/Captain, or departmental staff below the Warden's Office . . . ." Id. § IV(A)(3).  The IRS "must be received within 30 calendar days of the date on which the event complained of occurred," id. § IV(A)(1), "must contain sufficient detail to allow for investigation, including but not limited to: the inmate's/resident's name,

the date of the occurrence, the name(s) of departmental staff involved, the names of witnesses, the nature of the complaint or request and what relief or action is requested," id. § IV(A)(2), and must "refer to a single event, incident or subject matter." Id.

Second, the inmate must send a Grievance Form "to the Warden of the facility in which the inmate is currently housed." Id. § IV(B). The Warden "will review the grievance, direct an investigation be conducted as necessary, and respond to the grievance." Id. § IV(B)(3). The grievance "must be received within 30 calendar days from the date of the response to the first level IRS," id. § IV(B)(1), "must contain sufficient detail to allow for investigation, including but not limited to: the inmate's/resident's name, the date of the occurrence, the name(s) of departmental staff involved, the names of witnesses, the nature of the complaint or request and what relief or action is requested," id. § IV(B)(2), and must also demonstrate that "the request slip process has been utilized" or that "a waiver has been obtained" from that process. Id. § IV(B)(2). "A separate grievance must be filed regarding each request slip response that the inmate/resident wishes to appeal." Id. § IV(B)(2). The Warden "has 30 calendar days to respond to the inmate." Id. § IV(B)(1).

Third, the inmate must send a Grievance Form to the Commissioner's Office. Id. § IV(C). "The Commissioner's designee will review the grievance, direct that such investigation be conducted as necessary, and respond to the grievance." Id. § IV(C)(3). The grievance "must be received within 30 calendar days of the date of the response" by the Warden. Id. § IV(C)(1). The grievance also "must contain sufficient detail to allow for investigation, including but not limited to: the

inmate's/resident's name, the date of the occurrence, the name(s) of departmental

staff involved, the names of witnesses, the nature of the complaint or request and

what relief or action is requested."  Id. § IV(C)(2).  "A grievance will not be accepted

unless it demonstrates that the inmate/resident has previously utilized the request

slip process at the unit level and filed a grievance with the Warden . . . ."  Id.

§ IV(C)(2).  The Commissioner's Office has "30 calendar days to respond to the

inmate/resident in writing."  Id. § IV(C)(5).

The grievance policy also highlights two requirements as "mandatory."  First,

it stresses that:

> The timeframes set out in this policy are mandatory.  Prompt notice of
> complaints or issues is necessary to allow the Department to address
> issues in a meaningful way and to prevent problems from occurring.
> Failure to comply with the timeframes set out in this policy will result
> in a request or grievance being dismissed as untimely.
> Inmates/resident (sic) should be aware that failure to comply with
> these timeframes might impact their right to pursue any other legal
> remedy.

Id. § IV(D).  Second, it stresses that the use of the appropriate carbonless triplicate

forms is mandatory.  Notably, the timeliness requirement is the only requirement

that includes a warning to the inmate that his or her failure to comply could impact

his or her right to pursue other legal remedies.

B.   Exhaustion of claims concerning retaliatory transfer (Claim 1(a))

For Claim 1(a), defendants Hardy, Lirette, and McGrath contend that Stow

failed to properly exhaust his administrative remedies because they have not been

able to identify any IRS or grievance slip in the record in which Stow requested

monetary damages as relief for his allegedly unlawful transfer to NCF.  In their

view, NHDOC's grievance policy specifically requires prisoners to identify all forms

of relief or action sought, including monetary damages, in an IRS or grievance. Stow's requests, by comparison, focused on the termination of certain NHDOC personnel or a transfer back to NHSP's North Unit, not the monetary relief he now seeks.  These defendants argue that, because of this omission, Stow is administratively barred from bringing § 1983 claims seeking monetary relief.  Their argument fails to persuade, particularly in light of this court's recent decision in Morales v. Doe #2, No. 17-cv-234-SM, 2020 WL 1433776, 2020 U.S. Dist. LEXIS 51134 (D.N.H. Mar. 24, 2020).

In Morales, the defendants—prison officials at NHSP—similarly argued that an inmate's failure to specifically request money damages during his administrative grievances process required the court to dismiss the inmate's complaint.  2020 WL 1433776, at *7, 2020 U.S. Dist. LEXIS 51134, at *18-20.  Like Hardy, Lirette, and McGrath, the Morales defendants relied on the NHDOC grievance policy requirement that an inmate grievance include, among other things, "what relief or action is requested."  Id.  In rejecting this argument, this court observed that, while it is true "prisoners must exhaust their administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process,'" the PLRA's requirement to exhaust administrative remedies "'refer[s] to the procedural means, not the particular relief'" requested or ordered.  Id. (quoting Booth v. Churner, 532 U.S. 731, 734 (2001)); see also Booth, 532 U.S. at 734 ("[O]ne 'exhausts' processes, not forms of relief.").  Additionally, the Morales court noted that "there [was] no argument" that the plaintiff "skipped the administrative process" to NHDOC's detriment.  2020 WL 1433776, at *7, 2020 U.S. Dist. LEXIS 51134, at *20.

Here, it is similarly undisputed that Stow attempted to complete NHDOC's three-step administrative grievance process to seek relief for his allegedly retaliatory transfer to NCF.  See Warden's May 20, 2016 Response to Stow re: Transfer (doc. no. 35-2); Commissioner's June 20, 2016 Response to Stow (doc. no. 35-5); Stow's Mot. to Clarify (doc. no. 35) (explaining exhaustion timeline). Accordingly, this court similarly concludes that the defendants have not shown that Stow failed to properly exhaust the administrative remedies available to him before commencing suit, see Polansky, 2016 WL 237096, at *3, 2016 U.S. Dist. LEXIS 6476, at *8, and denies the defendants' motion for summary judgment to the extent it relies on exhaustion for Stow's retaliatory transfer claim (Claim 1(a)).

C.    Exhaustion of claims concerning McGrath's statements (Claim 2(a))

Next, McGrath contends that Stow failed to properly exhaust his administrative remedies with respect to his claims arising from McGrath's alleged "big-mistake" statement (Claim 2(a)), as Stow failed to deliver any IRS slip regarding this claim "within 30 calendar days of the date on which the event complained occurred."[7]  See NHDOC Grievance Policy (doc. no. 211-8, § IV(A)(1)). The court disagrees because prison staff waived any procedural error by responding to Stow's grievances on the merits.  See Warden's May 20, 2016 Response to Stow's Grievances re: Transfer (doc. no. 35-3).

As explained in Ellison v. N.H. Dep't of Corr., "a prison that considers the substance of an untimely filed complaint and decides it on the merits may arguably

---

[7] In his amended complaint, Stow alleges that McGrath made the "big mistake" statement on a date between February 10 and February 28, 2016.  Stow did not refer to the alleged statement in any IRS, however, until March 30, 2016 – 31 days after the latest possible date alleged by Stow (given the leap year).  See Mar. 30, 2016 IRS to Classifications (doc. no. 29-3, at 7).

be deemed to have waived its right to argue a failure-to-exhaust defense." No. 07-cv-131-JL, 2009 WL 424535, at *4 n.6, 2009 U.S. Dist. LEXIS 12976, at *14 n.6 (D.N.H. Feb. 19, 2009).  Though NHDOC did not explicitly waive the 30-day response deadline, it did not deny Stow's grievances regarding McGrath's "big mistake" statement on timeliness grounds.  See Warden's May 20, 2016 Response to Stow re: Transfer (doc. no. 35-2).  Instead, prison officials considered that grievance to be part of Stow's claims concerning his transfer and rejected the totality of Stow's claims on the merits.  Id.  As such, prison officials "effectively waived" the 30-day filing deadline required under its grievance policy.  Mallory v. Marshall, 659 F. Supp. 2d 231, 237 (D. Mass. 2009); see also Carter v. Symmes, No. 06-10273-PBS, 2008 WL 341640, at *3, 2008 U.S. Dist. LEXIS 7680, at *8-9 (D. Mass. Feb. 4, 2008) (holding that any deficiency in an inmate's grievance form was apparently waived because the prison addressed the inmate's allegations fully on their merits); Maraglia v. Maloney, No. 2001-cv-12144-RBC, 2006 WL 3741927, at *7, 2006 U.S. Dist. LEXIS 90805, at *21-22 (D. Mass. Dec. 18, 2006) (finding institutional time limitations waived where prison did not deny grievance because it was untimely, but rather because it was "non-grievable").

In light this waiver, McGrath cannot now assert that Stow failed to exhaust his administrative remedies on timeliness ground.  Accordingly, he has not shown that Stow failed to exhaust the administrative remedies available for his alleged "big mistake" statement (Claim 2(a)).

### D.    Exhaustion of denial-of-process claims (Claim 5(a))

Defendants Lirette and Perkins argue that Stow failed to exhaust his administrative remedies as to his denial-of-process claims against them (Claim 5(a))

because he failed to complete the three-step grievance process for claims against either defendant for their purportedly retaliatory statements.  In support of this position, they observe that the evidentiary record contains no IRSs or grievances relating to denial of process and that Stow conceded in his interrogatory answers that he "stopped the grievance" process as to these claims due to a purported "chilling effect."[8]  <u>See</u> Stow's Interrogatory Answers (doc. no. 211-8, at 2).  Stow, in turn, disputes these observations, asserting that there are genuine issues of fact as to whether he filed IRSs on this claim.[9]  Stow's Obj. to Mot. for Summ. J. (212) (doc. no. 233, at 68-69).  Additionally, he maintains that the defendants' actions rendered administrative remedies unavailable.  <u>Id.</u>  The court disagrees, finding that the record does not support Stow's allegations regarding exhaustion of this claim.

The PLRA requires exhaustion of only "such administrative remedies as are available."  42 U.S.C. § 1997e(a).  As discussed above, NHDOC policy sets forth a three-step administrative grievance beginning with the filing of an IRS. Nonetheless, "if prison officials make administrative remedies unavailable . . . the exhaustion requirement is obviated."  Gebo v. Thyng, No. 11-cv-047-JD, 2012 WL 2061693, at *5, 2012 U.S. Dist. LEXIS 78992, at *13 (D.N.H. June 7, 2012); <u>see also</u> Ross v. Blake, 136 S. Ct. 1850, 1858–60 (2016) (prison administrative procedure is unavailable if "it operates as a simple dead end—with officers unable or

---

[8] The court observes that under Fed. R. Civ. P. 33(b)(3), interrogatories must be answered "under oath" and that, as such, interrogatory answers may be admissible at trial under certain circumstances, <u>see</u> Bucci v. Essex Ins. Co., 393 F.3d 285, 297 (1st Cir. 2005).

[9] Stow did not object or respond to the exhaustion arguments raised in Perkins's motion for summary judgment.  <u>See</u> Stow Obj. to Mot. for Summ. J. (211) (doc. no. 236-1).  The court will construe the arguments raised in his objection to Hardy, Lirette, and McGrath's motion for summary judgment as also generally raised against Perkins.

consistently unwilling to provide any relief to aggrieved inmates"; if "no ordinary prisoner can discern or navigate it"; or if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").

Here, there is no genuine dispute that Stow failed to complete the three-step administrative grievance process given the absence of relevant IRSs in the evidentiary record, Stow's sworn interrogatory response that his grievances stopped at "level 1," and his continued insistence in his filings that NHDOC's administrative remedies were made unavailable due to the defendants' actions, see Stow's Obj. to Mot. for Summ. J. (212) (doc. no. 233, at 68-69).  In his objection, Stow suggests for the first time that, despite the absence of IRSs and his earlier positions, he did submit grievances that were lost or ignored.  Id.  He then argues that, under Gebo, this assertion (that he submitted a grievance), made under penalty of perjury, creates a genuine dispute of material fact that renders summary judgment inappropriate.  See 2012 WL 965097, 2012 U.S. Dist. LEXIS 38124 (D.N.H. Mar. 21, 2012).  In Gebo, however, the court did not find, as Stow believes, that an inmate's sworn statement, by itself, can create a genuine dispute of material fact where none existed.  Rather, it held that "the absence of [a] request slip" was "not determinative" when the prisoner's assertion was supported by affidavits of other witnesses, specifically a witness who saw the inmate place his grievance in the appropriate filing box.  Id. at n.1.  That is not the case here.

Stow provides no explanation regarding why his recent assertions contradict facts stated unambiguously in his interrogatory answers.  Stow cannot rely on that unexplained inconsistency to avoid summary judgment under such circumstances.

26

See Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001); Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 20–21 (1st Cir. 2000); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").  As such, Stow's suggestion that he did submit an IRS or grievance, uncorroborated by any other evidence, and unsupported by any explanation for the apparent contradiction with his prior unambiguous interrogatory answer, falls short of bringing the fact that he failed to complete the three-step grievance process into genuine dispute.

Additionally, no reasonable factfinder viewing the record in the light most favorable to Stow would find that Lirette's statements "had a chilling effect" on Stow or otherwise obviated his pre-suit obligations to pursue his claims through NHDOC's grievance process.  See Stow's Interrogatory Answers (doc. no. 211-8, at 2).  As explained above, Lirette warned Stow that he would write Stow up if Stow wrote to Lirette again about the transfer issue.  May 31, 2016 IRS to Lirette (doc. no. 212-8).  This warning did not prohibit or prevent Stow from writing to other NHDOC staff members or from filing an IRS regarding other issues, such as Lirette's purportedly chilling threat.  Indeed, Stow continued to submit IRSs to McGrath regarding his transfer after June 1, 2016—the date of Lirette's response.  See, e.g., June 23, 2016 IRS to McGrath (doc. no. 215-4, at 1); Aug. 8, 2016 IRS to McGrath (doc. no. 215-5, at 24).

The same is true with respect to Perkins's "direct order to discontinue any and every complaint" on the issue of extended library access for Stow's state court

case against NHDOC officers.  Mar. 10, 2014 IRS to Perkins (doc. no. 211-3, at 2).
The record shows that after Perkins issued this direct order, Stow sent numerous
IRSs and correspondence relating to extended library time to various NHDOC
personnel, including Poulin.  See doc. no. 30-2, at 2-21; doc. no. 30-3, at 1-23; doc.
no. 30-4, at 1-9.  As such, the record, even when viewed in the light most favorable
to Stow, does not support his contention that Lirette or Perkins's warnings had a
chilling effect that discouraged him from utilizing the prison's administrative
grievance process.  Cf. Morales v. Foster, No. 17-cv-234-SM, 2019 WL 441967, at *6,
2019 U.S. Dist. LEXIS 17431, at *15 (D.N.H. Jan. 3, 2019) (the "threat of
disciplinary action, without more," is nothing more than de minimis in the context
of a retaliation claim), R&R adopted, 2019 WL 440564, 2019 U.S. Dist. LEXIS
17125 (D.N.H. Feb. 1, 2019).

The undisputed record viewed in the light most favorable to Stow establishes
that Stow failed to properly exhaust the administrative remedies available to him,
and that these remedies remained available to Stow despite Lirette and Perkins's
warnings against abusing the grievance process.  The court therefore grants the
defendants' motions for summary judgment in Lirette and Perkins's favor as to
Stow's denial-of-process claims (Claim 5(a)) on exhaustion grounds and denies
Stow's cross-motion on that claim.

II.    Retaliatory transfer in violation of the First Amendment – Claim 1(a)

Turning to the merits of Stow's retaliatory transfer claim (Claim 1(a)), both
Stow and defendants Hardy, McGrath, and Lirette assert that they are entitled to
summary judgment on this evidentiary record.  Stow contends that his sworn
declaration and grievance filings of record clearly show the defendants' purportedly

retaliatory recommendation to Classifications was the but-for cause for his injuries. Hardy, Lirette, and McGrath counter that there is no competent evidence showing that they took an "adverse action" against Stow or bore any retaliatory animus against him.  Additionally, they assert that, even if a genuine dispute existed as to retaliation, they are protected by qualified immunity because Stow's transfer did not violate any clearly established right.  For the most part, the defendants are correct.

To prove a claim for retaliation for the exercise of First Amendment rights at summary judgment, an inmate must "adduc[e] facts sufficient to show" three elements: (1) he or she "engaged in a protected activity," (2) the prison or its agents "took an adverse action against" the inmate, and (3) "there is a causal link between the former and the latter."  Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011) (internal citations omitted).  If an inmate makes this showing, the burden shifts to the defendants to show that they would have taken the same action even without the retaliatory motive, see Collazo-Rosado v. Univ. of Puerto Rico, 765 F.3d 86, 95 (1st Cir. 2014) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)) (non-prisoner § 1983 retaliation claim involving public employee); Greene v. Doruff, 660 F.3d 975, 977 (7th Cir. 2011), or that they are otherwise shielded from liability by qualified immunity.

Here, the first element poses no problem for Stow: in filing grievances, Stow "plainly engaged in protected activity."  See Hannon, 645 F.3d at 48 (internal citations omitted).  As discussed below, however, no reasonable jury could find in favor of Stow on the third element—causation—as to Hardy or Lirette, who played no meaningful role in recommending Stow be transferred.  Additionally, Stow has

failed to show that no reasonable prison official within the First Circuit could conclude in 2016 that the First Amendment prevented a corrections officer from recommending the transfer of a prisoner to a different in-state facility because that prisoner filed grievances, even though that transfer could foreseeably result in the prisoner losing a high paying job and suffering negative economic consequences. The court thus grants summary judgment in the defendants' favor as to Stow's retaliatory transfer claim and denies Stow's summary judgment motion as to that same claim.

A.   Hardy and Lirette

Stow contends that the Hardy, Lirette and McGrath recommended him for transfer to NCF in retaliation for filing grievances.  This transfer resulted in Stow losing a high-paying job in NHSP's kitchens and accepting a job with fewer workable hours at NCF and a lower initial hourly wage.

Yet despite Stow's assertions to the contrary, nothing of evidentiary quality in the record suggests that Hardy and Lirette entered into an overt conspiracy with McGrath to have Stow transferred or otherwise exercised any influence over Classifications's ultimate decision to transfer Stow to NCF.[10]  As summarized above,

---

[10] A civil rights conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages."  Est. of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008).  Although "pro se complaints are to be read generously, allegations of conspiracy must nevertheless be supported by material facts, not merely conclusory statements."  Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir. 1980) (per curiam) (citation omitted).  Hardy and Lirette's limited roles in responding to his IRSs regarding his medication and ventilation, without more, do not create a reasonable inference that they joined in a conspiracy with McGrath.  Cf. Worthley v. Roberts, No. 2:15-CV-00207-GZS, 2015

McGrath was the only officer to suggest Stow's name as a potential candidate for transfer to NCF on the day Classifications called North Unit seeking recommendations for potential transferees.  Hardy—who was not involved in addressing Stow's medication grievances and had been away for 10 days in February—simply relayed McGrath's suggestion to Classifications over the phone. Hardy Decl. (doc. no. 212-3, at ¶¶ 7-8); McGrath Decl. (doc. no. 212-4, ¶ 5).  Lirette, in turn, reportedly said nothing when Classifications called North Unit and added nothing when McGrath mentioned Stow's name.  Hardy Decl. (doc. no. 212-3, at ¶ 8); see also Lirette Decl. (doc. no. 212-5, ¶¶ 6-7) (Lirette representing that he does not recall being present when Hardy received the call from Classifications).  The record is similarly devoid of evidence suggesting the two harbored any animus towards Stow at any time, including prior to Stow's transfer to NCF.

On this record, no reasonable jury could find that Hardy or Lirette played any meaningful role in Stow's transfer to NCF such that they could be liable for violating Stow's First Amendment rights.  See Williams v. Cutler, No. 1:14-cv-539-NT, 2016 WL 6651301, at *3, 2016 U.S. Dist. LEXIS 156194, at *7 (D. Me. Nov. 10, 2016) (granting summary judgment for the defendant where the record was "devoid of any evidence suggesting that the defendant participated in the decision to place [the inmate] on [a] 'watch list'").  Accordingly, the court grants summary judgment in their favor as to Claim 1(a) and denies Stow's motion on the same claim.

---

WL 4139647, at *3 (D. Me. July 9, 2015) ("[O]fficers who have merely participated in the review and denial of a prisoner's grievance, but who were not involved in the incident that is the subject of the grievance, ordinarily are not subject to liability under federal civil rights law.")

B.    <u>Qualified immunity</u>

Assuming, without deciding, that Stow has furnished sufficient evidence to make out a prima facie case of retaliation against McGrath, the court must assess whether McGrath is nevertheless shielded from liability by qualified immunity.  On this record, the court finds for McGrath.

 A prison official is entitled to qualified immunity "when [his or her] actions, though causing injury, did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Gray v. Cummings, 917 F.3d 1, 10 (1st Cir. 2019); <u>see</u> <u>also</u> Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Accordingly, the "qualified immunity analysis has two facets." Gray, 917 F.3d at 10. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendant violated the plaintiff's constitutional rights.  See Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018). Additionally, the court "must determine whether the allegedly abridged right was 'clearly established' at the time of the defendant's claimed misconduct." <u>Id.</u> "Although this description implies a set sequence," a court may freely "'alter the choreography in the interests of efficiency" beginning—and perhaps ending—with the second prong.  <u>Id.</u> (citing Matalon v. Hynnes, 806 F.3d 627, 633 (1st Cir. 2015)).

In satisfying this burden, "the plaintiff must identify either controlling authority or a consensus of persuasive authority sufficient to put [an objectively reasonable] officer on notice that his [or her] conduct fell short of the constitutional norm." <u>Id.</u> (international citation omitted);  <u>see</u> <u>also</u> Costa-Urena v. Segarra, 590 F.3d 18, 29 (1st Cir. 2009) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This authority must define the right with specificity, not at a high level of generality based on abstract principles.  See Ashcroft v. al-Kidd, 563 U.S. 731, 742

(2011).  And while a prior case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate," id. at 741, such that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply," District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018); see also White v. Pauly, 137 S. Ct. 548, 552 (2017) ("[T]he clearly established law must be 'particularized' to the facts of the case.").

Though "[i]t is well established that retaliating against an inmate for filing grievances violates that inmate's First Amendment rights," Mattei v. Dunbar, 217 F. Supp. 3d 367, 379 (D. Mass. 2016) (internal quotation marks omitted), the law is less than clear as to whether an inmate transfer like Stow's—an intra-state transfer foreseeably resulting in job loss, lost pay, and decreased future wages—constitutes an adverse act that violates the First Amendment when retaliation motivates the act.  As a general rule, an intra-state transfer of an inmate from one institution to another does not typically "constitute an adverse action" for purposes of a retaliation claim "since a transfer is merely an ordinary incident of prison life." Gosselin v. Kench, No. 12-cv-514-SM, 2013 WL 3245335, at *5, 2013 U.S. Dist. LEXIS 89881, at *15-16 (D.N.H. June 7, 2013) (internal citations and quotation marks omitted) (finding that transfer from NHSP to NCF was not retaliatory), R&R adopted, 2013 WL 3245335, 2013 U.S. Dist. LEXIS 91519 (D.N.H. June 26, 2013); Roy v. Wrenn, No. 12-cv-303-JD, 2012 U.S. Dist. LEXIS 185994, at *14 (D.N.H. Dec. 14, 2012) (same).  "[E]xcepted from this general rule" are "'exceptional cases' in which foreseeable, negative consequences 'inextricably follow'" from the allegedly retaliatory transfer.  Roy, 2012 U.S. Dist. LEXIS 185994, at *18 (finding nothing exceptional about conditions of confinement at NCF as compared to NHSP).

In his multiple filings, Stow identifies neither controlling authority nor a robust consensus of persuasive authority from which "any reasonable official in [McGrath's] position would have known" that recommending Stow for transfer to NCF, even though it could result in potentially significant economic harm, was exceptional or unlawful in the particular circumstances of record. This court is unaware of any controlling authority with similar factual circumstances from the First Circuit or the Supreme Court. Nor does there appear to be a robust consensus of persuasive authority from courts in other jurisdictions.

To the contrary, courts from across the country appear to split over the question whether a transfer under circumstances similar to Stow's could constitute adverse action that could sustain a § 1983 retaliation action. In the Second Circuit, for example, where the "[r]etaliatory transfer of a prisoner's housing and/or job assignment has long been prohibited," district courts have rejected prison officials' qualified immunity defenses where the inmate was able to make a prima facie case that he was transferred and suffered a loss in wages for filing administrative grievances. Walker v. Pataro, 2002 WL 664040 at *8, 19, 2002 U.S. Dist. LEXIS 7067, at *28, 61 (S.D.N.Y. Apr. 23, 2002) (finding adverse action where, "[a]s a result of his transfer out of [one building, an inmate] lost a job" and suffered a 60% pay cut); see also Battice v. Phillip, No. CV-04-669 (FB)(LB), 2006 WL 2190565, at *8, 2006 U.S. Dist. LEXIS 53407, at *27 (E.D.N.Y. Aug. 2, 2006) (stating that, if a transferred inmate "earned less in his new [job] assignment[,] this would constitute an adverse action"). By comparison, in the Sixth Circuit, district courts applying the rule set out in Siggers-El v. Barlow, 412 F.3d 693, 702 (6th Cir. 2005), have repeatedly found that the loss of a high paying job, "in and of itself," is not "a

sufficiently adverse consequence" as a matter of law where the inmate was able to obtain a comparable job after being transferred.  E.g., Moses v. Braman, No. 1:15-cv-260, 2017 WL 543270, at *1, 2017 U.S. Dist. LEXIS 18683, at *2 (W.D. Mich. Feb. 9, 2017); see also Siggers-El, 412 F.3d at 702 (holding that a transfer was an "adverse action" where it resulted in the plaintiff losing a high paying job that paid for his appellate attorney's fees and being moved further from that attorney, thus substantially inhibiting his ability to access the courts).

Given this mix of persuasive authority, and the lack of controlling authority, a prison official at NHSP in early 2016 reasonably could have concluded that the First Amendment did not shield an inmate like Stow from being a candidate for transfer from one medium-security housing assignment in Concord to a similar assignment in northern New Hampshire, even though that transfer could foreseeably result in the loss of a high paying job and negative economic consequences.  This is a reasonable conclusion only where the transfer does not impede the inmate from exercising fundamental rights.  See Siggers-El, 412 F.3d at 702.  Because McGrath's recommendation to have Stow transferred in retaliation for filing grievances did not violate a clearly established statutory or constitutional right when and where it occurred, see Stow v. Davis, No. 18-cv-768-JL, 2019 WL 6718160, at *7, 2019 U.S. Dist. LEXIS 214416, at *18 (D.N.H. Aug. 14, 2019), R&R adopted, 2020 WL 4605229, 2020 U.S. Dist. LEXIS 143723 (D.N.H. Aug. 11, 2020), he is entitled to qualified immunity on Stow's retaliatory transfer claim.  The court thus grants summary judgment against Stow and in McGrath's favor on Claim 1(a) and denies Stow's motion on that claim.

III.   <u>Threatening violence in violation of the First Amendment – Claim 2(a)</u>

As with Claim 1(a), both Stow and McGrath contend that they each are entitled to summary judgment on Claim 2(a), Stow's retaliatory threat claim.  Stow maintains that in February 2016, McGrath made a threat that he would "take a shot" at Stow, <u>see</u> Am. Compl. (doc. no. 28-2, at 11) ("You made a big mistake, if I get a clean shot at you I'm going to take it."), a statement which, on its face, arguably threatens to "kill" or otherwise inflict "serious bodily harm."  <u>See</u> Stow's Obj. to Mot. for Summ. J. (212) (doc. no. 233, at 41).  Stow asserts that McGrath's motivations in uttering such words were to menace Stow for, or deter him from, engaging in protected speech—the filing of administrative grievances.  McGrath, in turn, argues that there is no competent evidence showing that Stow's grievances were the "but-for" cause for the alleged threat, and that even if there were, he would be entitled to qualified immunity.  The court agrees on the latter grounds.

As a general principle, it is beyond dispute that verbal threats can constitute an adverse act that would deter an inmate of ordinary firmness from engaging in protected activities.  <u>See</u>, <u>e.g.</u>, Hill v. Lappin, 630 F.3d 468, 474 (6th Cir. 2010).  Whether a threat does "in a particular case," however, "is dependent upon the specificity of the threat and the context in which it was made."  Bourne v. Arruda, No. 10-cv-393-LM, 2011 WL 3423332, at *2, 2011 U.S. Dist. LEXIS 86359, at *6 (D.N.H. Aug. 4, 2011) (internal citation omitted).  "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights."  Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010).  Additionally, the "opacity" of a threat can do much to "soften[]" its "deterrent effect."  Bartley v. Collins, No. 95-cv-10161 (RJH), 2006 WL 1289256, at *6, 2006 U.S. Dist. LEXIS 28285, at *18-19 (S.D.N.Y. May 10, 2006) ("verbal threats such as 'we going to get

you, you better drop the suit,' do not rise to the level of adverse action"); Hart v. Goulette, No. 16-cv-028-PB, 2017 WL 1842551, at *2, 2017 U.S. Dist. LEXIS 69146, at *5 (D.N.H. Apr. 12, 2017) (finding that threatening an inmate with "consequences" was a de minimis adverse act).

Yet despite these common principles, no consensus has emerged among the federal courts as to whether a verbal threat alone, even one threatening death or violence, constitutes an adverse action that violates an inmate's First Amendment rights when uttered in retaliation for engaging in protected conduct. As previously noted, see Order Denying Mot. to Dismiss (doc. no. 182), several circuit courts of appeals have held that such retaliatory threats are unlawful. In Santiago v. Blair, for example, the Eight Circuit Court of Appeals ruled that a reasonable jury could find that an officer's statements—which implied that if the inmate did not drop his grievances, he would be found hanging in his cell and that his death would be made to look like a suicide—would chill an inmate of ordinary firmness from engaging in protected legal activities. 707 F.3d 984, 992 (8th Cir. 2013) (also finding that the officer was not entitled to qualified immunity, as the Court of Appeals had "long held" that threats of death or serious harm to an inmate could sustain a First Amendment retaliation claim (citing Burgess v. Moore, 39 F.3d 216, 218 (8th Cir. 1994)); see also Brodheim v. Cry, 584 F.3d 1262, 1270 (9th Cir. 2009) (ruling that inmate need not establish "an explicit, specific threat of discipline or transfer" as the "mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect"); Pittman v. Tucker, 213 F. App'x 867, 870 (11th Cir. 2007) (per curiam) (concluding that threat that prison officials would "do 'something drastic' if [the prisoner] continued to file

grievances," which "could easily be interpreted by an inmate as a threat of physical violence, either directly or thru [sic] deliberate inattention," was not de minimis).

Other courts, including many in the Second and Third Circuits, have held, however, that to succeed on a retaliation claim, a verbal threat, no matter how heinous, must be sufficiently specific and direct, or be accompanied by some reinforcing act or context which escalates the threat beyond mere words.  E.g., Boyd v. Larson, No. 1:16-cv-01789, 2017 WL 1904278, at *5, 2017 U.S. Dist. LEXIS 61725, at *12-14 (M.D. Pa. Apr. 21, 2017) (collecting cases), R&R adopted, 2017 WL 1862346 (M.D. Pa. May 9, 2017); Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (collecting cases); Evenstad v. Herberg, 994 F. Supp. 2d 995, 1001 (D. Minn. 2014) (concluding that the statement, "We'll be ramping things up," was too vague to state a claim, where the complaint provided no context to give the statement chilling effect, such as a "history of abuse or a pattern of threats" or an accompanying "menacing gesture").  This includes isolated and opaque death threats like McGrath's, purportedly uttered in retaliation for an inmate's grievances.  Compare Green v. Wetzel, No. 18-cv-093, 2019 WL 1426955, at *7, 2019 U.S. Dist. LEXIS 53416, at *9 (W.D. Pa. Mar. 29, 2019) (single incident where prison guards threatened to kill a plaintiff, absent any physical contact, was insufficient to constitute adverse action); Ayotte v. Barnhart, 973 F. Supp. 2d 70, 73, 94 (D. Me. 2013) (finding that prison officials threat that inmate should "shut his mouth," in reference to inmate's letters to advocates, and that "they would 'bury' him" did not constitute an adverse action, but repeated strip searches thereafter did satisfy the element); Bilal v. N.Y. State Dep't of Corr., No. 09-cv-8433, 2010 WL 2506988, at *16, 2010 U.S. Dist. LEXIS 61357, at *55 (S.D.N.Y. June 21, 2010)

(comments that an inmate "was 'lucky' because correction officers 'usually f\*\*\* people up for writing a bunch of bullshit grievances'" and that the inmate would "break or get broke[n] up" was not sufficiently specific or direct to constitute adverse action), aff'd sub nom. Bilal v. White, 494 F. App'x 143 (2d Cir. 2012), with Dixon v. Groeger, No. 2:16-cv-00178-NT, 2016 WL 4532066, at \*4, 2016 U.S. Dist. LEXIS 115482, at \*11-12 (D. Me. Aug. 29, 2016) (finding adverse action where the plaintiff had alleged an officer "confronted" the plaintiff about his grievance after having let an inmate into the plaintiff's cell to assault him), R&R adopted, 2016 WL 5720718, 2016 U.S. Dist. LEXIS 136662 (D. Me. Oct. 3, 2016); Hepworth v. Suffolk Cnty., No. 02-cv-6473, 2006 WL 2844408, at \*8-9, 2006 U.S. Dist. LEXIS 98422, at \*23 (E.D.N.Y. Aug. 1, 2016) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated against" inmate), R&R adopted, 2006 WL 2844408, 2006 U.S. Dist. LEXIS 73368 (E.D.N.Y. Sept. 29, 2006).

In the absence of either controlling authority from the First Circuit or Supreme Court, or a robust consensus of persuasive authority from across jurisdictions, the court cannot conclude that it would be clear to a reasonably competent officer at NHSP in 2016 that McGrath's opaque statement—"if I get a clean shot at you I'm going to take it"—unaccompanied by any additional acts or context, was sufficiently direct and specific as to deter an inmate of ordinary firmness from seeking relief through the prison grievance process. Accordingly, the court finds that qualified immunity protects McGrath against Stow's retaliatory threat claim (Claim 2(a)). The court therefore enters summary judgment against Stow and in McGrath's favor as to that claim.

IV.   <u>Dismissal of state-law claims</u>

Under 28 U.S.C. § 1367(a), a federal district court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  When, however, a district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over related state-law claims.  28 U.S.C. § 1367(c)(3).

Here, the court originally exercised supplemental jurisdiction over Stow's surviving state-law claims—specifically, Claims 1(d)(i), 1(d)(iii), 1(d)(iv), 1(d)(v), 1(d)(vi), 2(c)(ii), 2(c)(iii), 5(c)(i), 5(c)(ii), and 5(c)(iii)—by virtue of its original jurisdiction over Stow's First Amendment retaliation claims—Claims 1(a), 2(a), and 5(a).  As discussed above, however, the court, through this order, enters summary judgment in the defendants' favor on Claim 1(a), Claims 2(a), and 5(a).  Since there are no longer claims in this action over which the court has original jurisdiction, the court may decline to exercise supplemental jurisdiction over Stow's related state-law claims.  The court elects to do so.  Accordingly, Stow's state-law claims are dismissed without prejudice.

**CONCLUSION**

For the foregoing reasons, the court:

- Grants the defendants' motions for summary judgment (doc. nos. 211 & 212) as to all remaining federal claims (Claims 1(a), 2(a), and 5(a));

- Denies Stow's motion for summary judgment (doc. no. 215); and

- Dismisses, without prejudice, Stow's surviving state-law claims, Claims 1(d)(i), 1(d)(iii), 1(d)(iv), 1(d)(v), 1(d)(vi), 2(c)(ii), 2(c)(iii), 5(c)(i),

5(c)(ii), and 5(c)(iii), after declining to exercise supplemental jurisdiction.

Judgment shall be entered accordingly, and the case shall be closed.

**SO ORDERED.**

_____
Landya B. McCafferty
United States District Judge

March 29, 2021

cc:   Weston J. Stow, pro se
      Lynmarie C. Cusack, Esq.
      Seth Michael Zoracki, Esq.